**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**DAPHNIE CAMPBELL,**

> Plaintiff**,**

**v.**

> CIVIL ACTION NO.: 1:17-CV-177
> (JUDGE KEELEY)

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

> Defendant.

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On October 17, 2017, Plaintiff Daphnie Campbell ("Plaintiff"), by counsel Scott B. Elkind, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).  On December 11, 2017, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 8; Admin. R., ECF No. 9). On April 2, 2018, and July 3, 2018, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 14; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 23).  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

### II.    PROCEDURAL HISTORY

On June 27, 2013, Plaintiff protectively filed her application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on May 30, 2013. (R. 241-242).  Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2017; therefore, Plaintiff must establish disability on or before this date. (R. 31).  This claim was initially denied on January 9, 2014 (R. 150) and denied again upon reconsideration on April 14, 2014 (R. 168).  On June 4, 2014, Plaintiff filed a written request for a hearing (R. 182-183), which was held before United States Administrative Law Judge ("ALJ") Nikki Hall on February 2, 2016 in Morgantown, West Virginia. (R. 47-101).  Plaintiff represented by counsel Steven Slater, Esq., appeared and testified, as did Casey B. Vass, an impartial vocational expert. (Id.). On July 6, 2016, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 29-40). On August 15, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-3).

### III.     BACKGROUND

#### A.     Personal History

Plaintiff was born on March 8, 1965, and was forty-eight years old at the time she filed this SSI claim.[1] (R. 39, 241-242). She has completed four or more years of college education, earning a Master's Degree in Higher Education, specializing in college teaching and learning (R. 259). Plaintiff's prior work experience included as an instructional assistant, teacher, insurance salesperson, claims adjuster, billing clerk, and medical assistant. (R. 92-93). She was married at

---

[1] Plaintiff previously filed for Disability Insurance Benefits ("DIB") on September 30, 2010. Her claim was initially denied on January 21, 2011, denied again upon reconsideration on May 26, 2011 and denied by an ALJ following a hearing held on March 29, 2013. (R. 135).

the time she filed her initial claim (R. 242) and was married at the time of the administrative hearing. (R. 59). She has no dependent children. Id. Plaintiff alleges disability based on epilepsy, sleep apnea, high blood pressure, obesity, depression, left parietal brain lesion, herniated disc, chronic headaches, lymes disease, and irritable bowel syndrome. (R. 134, 258).

**B.     Medical History**

**1.   Medical History Pre-Dating Alleged Onset Date of May 30, 2013.**

Plaintiff reported to the Neurology Ambulatory Center of the University of Maryland Medical System in Baltimore, Maryland where she was seen by Dr. Mark H. Flasar. (R. 380). Plaintiff presented with complaints of abdominal pain and diarrhea to be evaluated for inflammatory bowel disease. Id. Dr. Flasar noted in Plaintiff's past medical history the following:

> Past medical history is significant for seizures. These are interestingly described as uncontrollable shaking and convulsing of all 4 extremities and foaming at the mouth. The patient is very clear that she is awake for these episodes and sees herself shaking and foaming at the mouth and subsequently sometimes loses consciousness.

(R. 382).

Plaintiff was seen by Dr. John Vitarello at the Cardiovascular Specialists of Frederick in Frederick, Maryland on February 14, 2011 based on a referral from Dr. William Swann. (R. 360). Plaintiff was referred based on an abnormal EKG "demonstrating evidence of old Septal MI". (R. 363).

On April 29, 2011, Dr. John Vitarello performed a cardiac, myocardial perfusion positron emission tomography (PET) scan on the Plaintiff that indicated chest pain, dyspnea on exertion, and abnormal ECG. (R. 365). Dr. Vitarello's impressions of the scan were that Plaintiff had "mild resting flow heterogeneity that improves after Persantine suggesting mild endothelial

3

mediated vasomotor dysfunction due to diffuse, non-obstructive, calcific coronary atherosclerosis". (R. 358).

Plaintiff presented to Barquist Army Health Clinic on May 15, 2012 for evaluation following a two-week hospitalization for "status epilepticus." (R. 861). Status epilepticus is a condition in which epileptic seizures are continuous for more than thirty minutes, or two or more seizures that follow one another without recovery of consciousness between them.[2] Plaintiff was counseled to "decrease her workday about 8 hours, works as an educator at the prison." Id. It was stated that "patient's seizure activity has diminished, is better, she still has daytime somnolence and falls asleep . . .  sleep has improved from 4-6 hours a night to 8-9 hours per night." Id. It was noted that Plaintiff had been prescribed and was actively taking Keppra for her seizure disorder. Id.

On June 29, 2012, Plaintiff was seen at Barquist Army Health Clinic for a migraine that she had been experiencing for over a week. (R. 851). Plaintiff reported that she has a lesion on her brain which she believed was the cause of her seizures and stated that the headaches she experiences exacerbate her seizure activity. Id. Plaintiff was referred to the Emergency Room for treatment of her headache, epilepsy, and recurrent seizures. Id. Treatment notes stated that a review of Plaintiff's electronic chart "reveals the patient has been to the ER" in February, March, April, May, and June "of this year, with multiple issues and admissions to the hospital." Id.

On September 12, 2012, Plaintiff was seen at Barquist Army Health Clinic for a review of medical care results and MRI for recurrent abdominal pain. (R. 566). At this time, it was stated that Plaintiff was experiencing "current migraine headaches" but that she "had no repetitive seizures." Id.

---

[2] Ajith Cherian and Sanjeev V. Thomas, *Status Epilepticus*, ANNALS OF INDIAN ACADEMY OF NEUROLOGY 12, 140-153 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2824929/.

Plaintiff was hospitalized at Frederick Memorial Hospital on December 8, 2012 with a chief complaint of a "headache described as a pressure and pounding sensation, a 7/10 in intensity." (R. 368). Plaintiff was found to have a "blood pressure in the 230s/100s" stated to be as a likely result of the "pain that she was suffering from." Id. After her headache improved, Plaintiff was discharged on December 10, 2012. Id.

Plaintiff was seen at Barquist Army Health Clinic on January 10, 2013 for a referral to neurosurgery at the University of Maryland to undergo an MRI of her brain under sedation. Plaintiff was cleared to undergo anesthesia for the MRI study. (R. 784).

Plaintiff was seen at the University of Maryland Medical System on January 30, 2013 to undergo an MRI of her brain. (R. 387). The indication of the MRI showed that Plaintiff suffered from a brain lesion. Id. The lesion was reported as being in a stable appearance when compared with the prior remote examination of January 2005. The MRI report goes on to state that the "diagnostic considerations that are favored include cortical dysplasia or chronic parenchymal injury." Id.

### 2. Medical History Post-Dating Alleged Onset Date of May 30, 2013.

An emergency department treatment record from Frederick Memorial Hospital dated July 21, 2013, shows Plaintiff was taken to the hospital after experiencing a seizure while driving. (R. 418). The record states that Plaintiff "was driving" and felt she was "having a seizure coming on. She called her family and then pulled over. Then she had a seizure. Her sister arrived at scene, no injury, sister states patient has generalized convulsion for 10 minutes. Then confused." Id. Plaintiff remained confused, had a diffuse headache, and her blood pressure was elevated. Id.

Plaintiff presented at Frederick Memorial Hospital on August 5, 2013 indicating she was experiencing a headache on the top of her head and is attributed to a parietal brain lesion. (R.

413). Plaintiff was seen at Frederick Memorial Hospital two weeks prior for "seizure recurrence." Id. Plaintiff was experiencing associated dizziness off and on with pain. Id.

A treatment note from Barquist Army Health Clinic dated August 26, 2013, indicates Plaintiff had been "in and out of ER for last two weeks" while experiencing headaches and suffering from seizures during that time. (R. 726-727).

Following further recurrent ER visits throughout September, Plaintiff's primary care provider, Dr. William Swann at Barquist Army Health Clinic issued the following advisement by record on September 30, 2013, "Ms. Campbell suffers from a seizure disorder, recurrent migraine headaches and uncontrolled hypertension. It is my recommendation that she does not drive . . ." and further recommended that any and all possible efforts be afforded to Plaintiff for assistance to arrange transportation to her medical appointments and important meetings. (R. 703).

Plaintiff was seen at Barquist Army Health Clinic on December 31, 2013. The treatment note indicates that Plaintiff would soon have a bariatric surgery to assist her with the health problems she had been experiencing as a result of obesity. (R. 674). The note further indicates that Plaintiff's blood pressure and hypertension were still not well controlled. Id. Her blood pressure on this date was 150/96 which the note indicated was a "good number for her" considering her body habitus and stress. Id. The note further states that Plaintiff's seizures at this time were "stable." Id.

Plaintiff was seen by Dr. Swann at Barquist Army Health Clinic on January 17, 2014, for a "planned back injection" and a follow-up appointment from an Emergency Room visit. (R. 668). The note states that Plaintiff suffered a seizure in mid-December that caused her to fall but had not had any further episodes. Id.

Plaintiff presented at Frederick Memorial Hospital on March 27, 2014 for monitoring by electroencephalogram (EEG) over interval periods of time between March 27, 2014 and March 30, 2014. (R. 945-950). Reports from Plaintiff's observation indicate she experienced a convulsive seizure during her admission for "elective cardiac catheterization." (R. 947). EEG interpretations provided as follows:

> The patient's episode of rocking back and forth and subjective feeling of having a seizure was nonepileptic . . . This is an abnormal awake, drowsy, and asleep EEG due to mild generalized slowing. Generalized slowing indicates diffuse cerebral dysfunction as seen in metabolic, toxic, or multifocal or diffuse structural abnormalities, including dementia or other neurodegenerative diseases.

(R. 945-950).

Plaintiff presented at Meritus Medical Center in Hagerstown, Maryland on July 15, 2014 where she underwent a gastric bypass surgery. (R. 951). Plaintiff postoperatively developed some nausea and vomiting but was treated and discharged home on July 20, 2014 in stable condition. Id.

On June 29, 2015, Plaintiff reported to the Emergency Department of Berkeley Medical Center with multiple seizures. (R. 875). Plaintiff began to smell flowers, which has been indicated as a signal to her that she may soon experience a seizure, and did experience a seizure lasting approximately ten minutes in duration. Id. Plaintiff experienced a second seizure shortly afterwards lasting about five minutes in duration. Id.  Plaintiff's husband called EMS and Plaintiff experienced two more seizures in the ambulance while in route to the hospital. Id.  Prior to Dr. Christopher Gentle's arrival in Plaintiff's patient room, Plaintiff experienced yet another seizure. Id. Dr. Gentle described Plaintiff's seizures as "tonic clonic" and consistent with her past seizures. Id.  Dr. Gentle reported that Plaintiff's last seizure prior to this episode was in April,

two months prior. Id. Plaintiff stated that she had been taking her prescribed seizure medications as directed. Id.

Plaintiff received an MRI on her brain on June 30, 2015 while hospitalized at the Emergency Department of Berkeley Medical Center with multiple seizures. (R. 892). Impressions of the MRI included "no acute findings, no abnormal enhancement" and "no evidence of any temporal lobe lesions." Id.

Plaintiff was seen at Parkway Neuroscience and Spine Institute on July 27, 2015 where she presented with complaints of a seizure. (R. 1107). Plaintiff had been referred to Parkway by Dr. Debra Bavari from Barquist Army Health Clinic at Fort Detrick for a neurological consultation. Id. Plaintiff was accompanied by her husband. Id. The record states that Plaintiff "relates having one seizure every one to two years and prior to this June, the last event was on April 09, 2015 and prior to that about two years ago." Id. The record further states that Plaintiff had been evaluated at the "University of Maryland in the past with SPECT scans that reportedly showed a lesion, now gone." Id. The record states that as part of Plaintiff's evaluation at Berkeley Medical Center between June 29, 2015 and July 4, 2015 when she was discharged, she "had a MRI Brain on 6/30 that was 'normal for age.' A prior MRI dated 2/17/07 was also reviewed with no change." Id.

Plaintiff was seen at the Berkeley Medical Center, West Virginia University Healthcare Emergency Department on September 20, 2015 with her chief complaint listed as "seizure." (R. 1013). The Emergency Department Visit Note states that Plaintiff's husband returned home and found Plaintiff in an ambulance. Id. The note further states in regard to the frequency with which Plaintiff experiences seizures, "she explains that 'I can go a while without having' a seizure. Husband reports that 'it varies, she can go months or every week.'" Id.

8

Plaintiff was further hospitalized due to experiencing a Gastrointestinal (GI) bleed on October 4, 2015. (R. 997-1001). Plaintiff was discharged in a stable condition the same day. Id.

Plaintiff was seen by Parkway Neuroscience and Spine Institute on January 19, 2016 complaining of seizures. (R. 1106). Plaintiff stated she had been having increased seizures, having experienced a seizure on January 15, 2016 and being taken to Frederick Memorial Hospital by ambulance where she was treated in the Emergency Department. Id. Plaintiff stated her seizures had been "stable until this year." However, Plaintiff stated her seizures have been occurring three times per week "at the worst." Id. Dr. Khatuna Gurgenashvili stated Plaintiff's seizures "are not well controlled at this stage." (R. 1108).

Plaintiff presented to the Berkeley Medical Center, West Virginia University Healthcare Emergency Department on January 26, 2016 after experiencing a seizure at 10:30 A.M. that morning. (R. 1170). Plaintiff stated her seizure lasted approximately ten minutes and was followed by a severe headache. Id. After a review of the patient's relevant previous records and charts, it was noted that Plaintiff has a history of "pseudoseizures." (R. 1174).

Plaintiff again presented to the Berkeley Medical Center, West Virginia University Healthcare Emergency Department by ambulance on February 4, 2016, after experiencing a seizure. (R. 1201). Plaintiff experienced two more seizures on the morning of February 19, 2016 after experiencing tremors through the night and returned to the West Virginia University Healthcare Emergency Department. (R. 1252). Plaintiff was seen just two weeks prior and stated she feels like she "can't get it under control." Id.

In a Seizures Impairment Questionnaire completed by Dr. Edward Thompson on February 8, 2016, Dr. Thompson stated that he has been a part of the Plaintiff's treatment at Barquist Medical Health Clinic at Ft. Detrick since her first examination there on January 8,

2010. (R. 1098). Dr. Thompson stated that Plaintiff's most recent exam was on January 28, 2016. Id. Dr. Thompson provided that Plaintiff's seizures are quite variable, most typically about two per month but since October of 2015, she has been experiencing approximately two or three seizures per week. Id. He further stated that Plaintiff's seizures are convulsive and atypical. Id. Dr. Thompson stated that stress can precipitate Plaintiff's seizures and that she is incapable of even low stress work. Id.

After a seizure, Dr. Thompson stated that Plaintiff needs to rest for hours to recover. Id. In Dr. Thompson's opinion, as a result of her medical impairments, he stated Plaintiff does not currently retain the functional ability to work in a competitive environment, in even a sedentary occupation, on a full-time, eight hours a day, five day a week basis because her seizures "are uncontrolled and she is constantly in imminent danger of having another seizure with attendant loss of consciousness." (R. 1099). Dr. Thompson opined that, before needing to change positions, Plaintiff could sit for one to two hours, could stand for thirty to forty five minutes, and could walk for ten to twenty minutes. (R. 1100). Dr. Thompson further opined that Plaintiff could never lift and/or carry any amount of weight. (R. 1101). Dr. Thompson stated that "uncontrolled seizures are a danger to the patient and potentially to others in any work environment" and for this reason, Plaintiff could not work at a regular job on a sustained basis. Id.

### 3. Medical Reports/Opinions

#### a. *Disability Determination at the Initial Level*

On January 8, 2014, agency reviewer Fulvio Franyutti, M.D. reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (R. 134-149). Reviewer, Dr. Franyutti, found the following exertional limitations: Plaintiff could occasionally

lift and/or carry twenty pounds and she could frequently lift and/or carry ten pounds. Dr. Franyutti further found that Plaintiff could stand, walk, and/or sit for a total of about six hours in an eight (8) hour workday. Her ability to push and/or pull was found to be unlimited, other than shown, for lift and/or carry. (R. 144).

As to postural limitations, reviewer, Dr. Franyutti found that Plaintiff could occasionally climb ramps and stairs but could never climb ladders, ropes, and/or scaffolds. Dr. Franyutti further found Plaintiff could occasionally balance, stoop, kneel, and crouch, but could never crawl. (R. 145). No manipulative, visual, or communicative limitations were found. Id.

As to environmental limitations, Plaintiff could have unlimited exposure to wetness, humidity, and noise. However, Plaintiff should avoid concentrated exposure to vibration. As to environmental hazards, Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and extreme heat as well as concentrated exposure to fumes, odors, dusts, gases, poor ventilations, etc. (R.145-146).

On November 12, 2013 agency reviewer Frank Roman, Ed. D. reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") assessment and mental residual functional capacity assessment ("MRFC"). (R. 142, 146-147). In the PRT, Reviewer Roman found Plaintiff had mild restrictions of activities of daily living as well as mild difficulties in maintaining social functioning. Reviewer Roman further found Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. Reviewer Roman found Plaintiff had no repeated episodes of decompensation. (R. 142).

In the MRFC, Reviewer Roman found that Plaintiff had no limitations as to memory or understanding. He found she does have a sustained concentration and persistence limitation. Regarding these limitations, Reviewer Roman noted that Plaintiff's ability to carry out very short

and simple instructions is not significantly limited. Her ability to carry out detailed instructions and her ability to maintain attention and concentration for extended periods was moderately limited. She was not significantly limited with regard to her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 146). Reviewer Roman further found that Plaintiff's ability to sustain an ordinary routine without special supervision, ability to work in coordination with or in proximity to others without being distracted by them, and her ability to make simple work-related decisions were not significantly limited. (R. 147).

Further, her ability to complete a normal workday and workweek without interruptions form psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was not significantly limited. When prompted to explain the sustained concentration and persistence capacities and/or limitations, Reviewer Roman stated that Plaintiff "reports her seizures leave her confused and disoriented for a period of time. She is on probation for 5 years for misappropriation of funds. Has a MA degree in education and taught in several capacities." Id.

### b.  Consultative Examinations

#### i.  *Mental Status Examination*

On November 7, 2013, Plaintiff was seen by Harry W. Hood, M.S. of Psychological Consulting in Martinsburg, West Virginia, for a consultative mental status examination. (R. 645-648). Mr. Hood stated Plaintiff presented with symptoms of depressed mood "where she is depressed two or three days per week with low energy, low motivation, crying, impairments in self-esteem, and no suicide or homicidal thoughts." (R. 646). Mr. Hood further noted that

Plaintiff reported "elevated levels of anxiety where she tends to worry a lot concerning her health and her overall function." Id.

Mr. Hood stated that the Plaintiff's attitude and behavior was cooperative, her speech was clear, and her orientation was present. (R. 647). He further stated that Plaintiff's mood was normal and her affect was broad. Id. Plaintiff's stream of thought was well organized and there were no reports of delusions, phobias, or obsessions nor were any illusions or hallucinations found to be present in Plaintiff's perception. Id. Mr. Hood stated Plaintiff's insight was good and her judgment was average. Id. No suicidal or homicidal ideations were reported. Id. Her immediate memory and remote memory were within normal limits while her recent memory was "moderately deficient with the claimant recalling two of the four words after delay." Id. Plaintiff's psychomotor behavior, persistence, and pace were all within normal limits while her concentration was "mildly deficient." Id. Mr. Hood stated that Plaintiff's social skills during the interview were appropriate. Id. Mr. Hood's prognosis of Plaintiff was "fair." (R. 648).

### ii. *Disability Determination Examination*

On December 5, 2013, Plaintiff was evaluated by Dr. Seth Tuwiner in Hagerstown, Maryland. (R. 653-656). Dr. Tuwiner stated that the reason for the consultation was for epilepsy, severe sleep apnea, hypertension, obesity, left parietal brain lesion, herniated disc, chronic headaches, Lyme disease, irritable bowel syndrome and depression. (R. 653). In the section for "review of records", Dr. Tuwiner stated "no records available." Id. Dr. Tuwiner stated the following in Plaintiff's history of present illness,

> The claimant, in January 2003, had a seizure. She underwent an MRI showing an unspecified parietal brain tumor. She did not undergo a biopsy, though since this point in time she has been under observation. The interval MRI studies have shown that there has been no growth. It is currently deemed not to be an aggressive lesion. She has intractable seizures. The last seizure was in August 2013. She is currently maintained on Keppra. She also had had headaches her

13

> whole life prominently on the left side, pounding in quality, occurring almost every day. Her headaches may vary throughout the day though, or worse at times in the morning.

Id. Dr. Tuwiner opined that Plaintiff can do all activities of daily living and can walk twenty minutes at a time. (R. 654). In his functional assessment of the Plaintiff following a physical examination, Dr. Tuwiner stated the following,

> The number of hours that the claimant can be expected to stand or walk in an 8-hour day is approximately 5-6 hours. She has no limitation with sitting. She does not require an assistive device. She has frequent postural limitations with bending, stooping, and crouching. She has no manipulative limitations. The amount of weight she can lift both frequently and occasionally is approximately 30 pounds occasionally and 15 pounds frequently. The claimant has seizure disorder. She should avoid elevated heights and uneven surfaces, operating heavy machinery and driving. No other relevant limitations at this point in time.

(R. 655-656).

### c.  *Disability Determination at the Reconsideration Level*

On April 11, 2014, agency reviewer Subhash Gajendragadkar, M.D. reviewed the prior RFC assessment, agreed with the findings, and affirmed the prior assessment as entered. (R.163).

On April 7, 2014, agency reviewer Edward Shaver, Ed. D. reviewed the prior PRT/MRFC assessment, agreed with the findings, and affirmed the prior assessment as entered. (R.164).

## C.  Testimonial Evidence

At the ALJ hearing held on February 2, 2016, Plaintiff testified that she is married and has two children but none that would qualify as dependents. (R. 59).  Plaintiff testified that her highest level of education attained is a Master's Degree in education that she completed online. (R. 61). Plaintiff testified that she has received income through unemployment but has not received unemployment since May of 2013. (R. 62). Plaintiff stated she was not receiving disability payments from any source. Id. She stated that she was not currently working full-time,

14

part-time, or under the table and has not performed any "volunteer activities." Id. However,
Plaintiff stated that she has done work "over the past two or three years" where she was
"compensated in good or services." (R. 63). When asked by the ALJ what work she had done,
Plaintiff stated that she had tried to work on "November the 11th of last year" and the following
exchange occurred:

> A:   At the Macy's Warehouse, was a seasonal job, so I worked there from November
>      the 11th, and it wasn't every day. It was like 18 hours, like three days, until –
> Q:   So it was just part-time.
> A:   It's called seasonal. They don't even call it part-time.
> Q:   Okay.
> A:   That job ended probably the first week of January, and I kept a record of my
>      seizures, and part of what Dr. Goodman had explained to us, the neurologist at
>      Parkway in Hagerstown, is that how exhausted and things you get, but he said,
>      you know, your body is going to do things that you cannot control. So with me
>      working like that, I kept a calendar, and I told my husband you have to learn how
>      to keep me – if I'm unconscious, you have to call 911. If I'm not unconscious,
>      you guys have to learn how to deal with me, talk to me to get me out of it, make
>      sure I have the Ativan to get me out of it because I have an aura where I smell
>      flowers, so I try to take the Ativan then before it really gets to the point where the
>      flowers are real strong, and I'm just out of control where I know a bigger seizure
>      is going to come. So my husband wrote down on the calendar the days that I had
>      the seizures since I'd been working. It was like three or four a week for me just
>      working those 18 hours. It was very difficult, but I tried.

(R. 63-64).

Plaintiff testified regarding her past work experience. Plaintiff stated that in 2001 and
2002 she worked for Mid Atlantic Medical Services as a sales executive where she "sold
medical, dental, life, short-term and long-term disability insurance benefits." (R. 64-65). In 2002
and 2003, Plaintiff worked for Advance Payment Service Systems who she stated that their name
had changed to "Concentra Preferred Systems" where she negotiated hospital claims. (R. 65).  In
2003, Plaintiff went to work for T.J. Rock Enterprises performing medical billing. (R. 66).
Plaintiff next worked at the Pediatric Center of Frederick but was unable to recall the dates in
which she worked there as a medical assistant. (R. 67-68). Soon thereafter, Plaintiff left the job at

the Pediatric Center for a position at Cherokee Medical Services in 2004, an outside contractor

with the U.S. Naval Academy, where she worked as a medical assistant in the Family Health

Clinic. (R. 66-68). In 2009, Plaintiff testified she began working for Kaplan teaching the medical

assistant program and from 2002 to 2011, at various points in time, Plaintiff worked for

Frederick County Public Schools as an instructional assistant. (R. 69). Finally, Plaintiff worked

as adjunct faculty part-time with the Frederick Community College teaching in the GED

program. (R. 69-70).

The ALJ then asked the Plaintiff what she would describe as being the "major thing that

keeps" her from working. (R. 70). Plaintiff responded as follows:

> A:   My seizures is the major thing that keeps me from working. I thought that, you
> know, when I – I had some really bad seizures when I was at Frederick County
> Public Schools. They happened at Frederick County Public Schools, so they
> should be on record there too. I thought that, you know, because people have
> seizure disorders they cold work every day. That's what I thought. Everybody is
> different. For me now I'm older, I have a lot of medical problems, you know, I
> had the gastric bypass from my records. I was very sick, I almost died last year. I
> had the pulmonary embolism in my lungs. I had the two GI bleeds. You know, it
> has weakened my body a lot. The seizures . . . I'm taking a lot of the medicine
> that they gave me, the 3, 500. I'm on a lot of seizure medication . . . But the
> seizures themselves, they're not any better, and it's something I live with every
> day . . . I'm on some new heart medicine also, but every time you have a seizure,
> your heart weakens too, so . . . there's concern with my cardiologist now because
> my heart rate is dropping down in the 40's . . . my lifestyle at home has changed
> really – it is not too much I can do, activities, everything.

(R. 70-71). Plaintiff testified she is taking the following medications to help treat her conditions:

Keppra, Metoprolol, Prilosec, folic acid, Aldactone, Ativan, a B6 pill and B12 shot, probiotics,

Clonidine as needed, an iron supplement, Tylenol with codeine as needed, Percocet as needed for

pain management, Topamax, and Lisinopril. (R. 72-74). Plaintiff testified that she is often tired

or drowsy and dizzy because of taking these medications. (R. 74-76).

Plaintiff was then examined by her attorney, Steven Slater. Mr. Slater asked the Plaintiff to explain what was happening with her seizure disorder at her previous job with Frederick County Public Schools during her last couple months of employment. (R. 77). Plaintiff testified the following:

> A:   [t]he seizures that I had then is the same thing that happens now. I don't have a sugar problem, I've been tested. My sugar will drop for some reason when I have a seizure. We're not sure why that happens, and they've done the A1C. My sugar is fine. I'm not diabetic. I do not have a problem with sugar, but for some reason with my types of seizures, it makes my sugar drop. And there my sugar dropped down to 16. They could not find a heart rate. They didn't have a pulse, and they had to get me stable to get me moved, but, like I said, I had like three of those, I think, at T.J. Middle School, and they're all documented because of the school . . . they had to call an ambulance to the school.

(R. 77-78). Plaintiff testified she experienced her first seizure on January 1, 2003. (R. 78). The ALJ asked Plaintiff how she was able to work while suffering from her seizure disorder from 2003 to 2013 and Plaintiff stated,

> A:   "that job I didn't work every day . . . I taught like two classes, and maybe it was like two and a half hours in the morning . . . and then I taught like an hour and a half in the afternoon . . . maybe 12 hours a week is maybe was my total that I taught the GED classes that I taught."

(R. 78). When asked by the ALJ how frequent her seizures were during that time period, Plaintiff responded, " . . . then they were about twice a week . . . The weekend is when I really got hit hard with it." (R. 79). The ALJ then asked the Plaintiff about the frequency of her seizures since July 30, 2013 and Plaintiff testified that the frequency of her seizures have increased since that time. Id. Plaintiff later stated that her seizures are currently occurring about three times per week. (R. 84).

Plaintiff testified that she receives her primary care provider through a military clinic, the Barquist Army Medical Clinic at Fort Detrick and that she has received care there for approximately ten years. (R. 80). When asked by the ALJ who primarily treats her for her seizure

disorder, Plaintiff stated she has been under the care of a neurologist, Dr. Rafiq, and is now under the care of a neurologist at Parkway Neuroscience in Hagerstown, Maryland[3] who prescribes Plaintiff her seizure medication. (R. 80-82). Plaintiff further testified that she regularly sees a cardiologist, Dr. Vitarello in Frederick, Maryland, for follow-up regarding issues with her heart rate when experiencing a seizure. (R. 82).

In regard to her daily activities, Plaintiff testified that she doesn't do anything, stating "I'm just saying I don't do anything because I'm afraid at this point in my life right now until things get worked out, answers, I don't do much of anything. We have to really plan around how I feel." (R. 86). Plaintiff further testified that her husband "does everything" in terms of household work such as cooking and cleaning. (R. 91).

### D. Vocational Evidence

Also testifying at the hearing was Casey Vass a vocational expert. Mr. Vass characterized Plaintiff's past work as follows:

> A:   The first job is an instructional assistant, 249.367-074. The strength requirement is light, the SVP is 3, it's semi-skilled. Next a teacher. The code is 099.227-030. It's a light job, with an SVP of 6, and skilled. Next I have is a claims adjustment. The code is 241.137-018. It's a sedentary job, with an SVP of 7, and skilled. I have a billing clerk. The code is 214.382-014, sedentary job, with an SVP of 4, semi-skilled. The last job I have is listed as a medical assistant. The code is 079.362-010. The exertional level is light, it's SVP or skill level is 6, skilled employment.

(R. 93).

With regards to Plaintiff's ability to return to her prior work, Mr. Vass gave the following responses to the ALJ's hypothetical:

> Q:   Thank you. Let's assume a hypothetical individual of the same age, education, and work background as the claimant, who is capable of performing work at the

---

[3] Plaintiff stated she first saw Dr. Goodman, a neurologist at Parkway Neuroscience when beginning her treatment there. However, Plaintiff related that she was unsure of whom her current neurologist is and that she has been seeing a physician assistant at Parkway. (R. 81-82)

> light level as defined in the relations. All postural are occasionally, except never climb ladders, ropes, or scaffolds, or should not require exposure to hazards such as unprotected heights, or moving mechanical parts. The work should not require greater than occasional exposure to concentrated levels of extreme temperatures, and vibration, fumes, dust, odors, or pulmonary irritants. Would such a person be able to perform the claimant's past work either as she actually performed the work, or as the work is generally performed in the national economy?
>
> A:   Yes, all the past work.
> Q:   Would that be as actually performed, and customarily performed?
> A:   Correct.

(R. 93-94).

Incorporating the above hypothetical, the ALJ then questioned Mr. Vass regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels. Mr. Vass responded as follows:

> A:   Let's see, a mail clerk. The code is 209.687-026; 120,000 jobs in the nation. Office assistant. The code is 239.567-010; 85,600 jobs in the nation. Assembler. The code is 729.684-046; 180,000 jobs in the nation. These jobs are unskilled. SVP of 2, and they're light in exertion.

(R. 94).

Next, the ALJ made several adjustments to her original hypothetical and the following exchange occurred:

> Q:   Let's take that same hypothetical, but add to that that the job must allow work be carried out in two-hour increments, which can be accompanied by regularly scheduled breaks. Would that change your testimony?
> A:   No.
> Q:   Would the jobs that you provided in response to the hypothetical remain the same?
> A:   Same jobs, same numbers, yes, ma'am.
> Q:   And if I were to take hypothetical number two, and add to that that the work should never require commercial driving of any sort, or operation of heavy machinery, would that change your testimony?
> A:   No change.
> Q:   Same numbers?
> A:   Correct.
> Q:   For the additional jobs. And if I were to take hypothetical number three, and I would say that work should not require ambulation on uneven surfaces as a requirement of the job, would that change your testimony?

A:     No.

Q:     Would the same jobs be available with the same numbers?

A:     Correct.

Q:     And if I were to say that work should be performed in a low stress . . . except that work should be performed in a low stress setting, which is defined as no fast-paced production requirements . . . no more than occasional changes in work routine or work setting, and no supervisory duties as a requirement of the job. Would that change your testimony?

A:     No.

Q:     And the past work would remain?

A:     Yeah, the past work - - the jobs I've listed, the unskilled jobs, wouldn't change. The past work, the fast-paced, medical assistant, I don't think I'd list the past work.

Q:     What do you mean by that?

A:     I mean I don't thing she can do the past work with the low stress, and the - - some of the jobs have a pretty good pace, so - -

(R. 94-96).

The ALJ next asked Mr. Vass regarding the customary tolerance for absences from work and Mr. Vass responded it was a "day and a half a month." (R. 96-97).

Next, Plaintiff's attorney, Steven Slater, questioned Mr. Vass. The following exchange occurred:

Q:     Mr. Vass, I'll take the judge's second hypothetical, which was her first one she added work in two-hour increments . . . If you added to that work in two-hour increments, but you had to rest for an hour in between the two-hour increments, would that hypothetical individual be able to perform the jobs you listed, or any other work?

A:     No jobs.

Q:     What if you reduce that work in two-hour increments with a 30-minute break in between each two-hour increment? Would that hypothetical individual be able to perform the jobs you listed, or any other jobs?

A:     No, sir.

Q:     And then jumping down to the seventh hypothetical about the work tolerances for absences in a month, if a hypothetical person say they had to go - - they missed work because they were in the hospital for two days a month, would that preclude all employment?

A:     It exceeds it, so, yes.

Q:     So even if that hypothetical individual were able to obtain a job, they would be unable to maintain competitive employment?

A:     Two days a month, I agree.

(R. 97-98).

**E.     Disability Reports**

A Disability Report Form - Appeals dated March 4, 2014 states a change in Plaintiff's illnesses, injuries, or conditions since she last completed a disability report. Plaintiff stated the following in regard to changes that had occurred: "Heart Condition-Endothial Dysfunction Hypothyroid-cysts on my thyroid, taking synthroid Seizures-night tremors every night Frequent Headaches Lyme Disease." Plaintiff approximated these changes to have occurred on September 1, 2013. (R. 295).

The report form further states Plaintiff has new physical or mental limitations because of her illnesses, injuries, or conditions since she last completed a disability report. Plaintiff stated the following regarding her new physical or mental limitations:

> Mental-brain lesion does not allow me to remember things, causes headaches and inability to make timely decisions. University of Maryland surgeon said that my lesion was too deep to operate so they are going to watch it. The lesion is ly[i]ng there dormant. Any change and we will be looking at brain surgery.

Plaintiff approximated these changes to have occurred on January 1, 2012. (R. 295).

The report form goes on to state the Plaintiff has new illnesses, injuries, or conditions since she last completed a disability report. Plaintiff stated the following regarding her new illnesses, injuries, or conditions: "Thyroid, herniated disc, blood pressure." Plaintiff approximated these new changes to have occurred on May 1, 2013. (R. 295).

The report form further states a change in Plaintiff's daily activities. Plaintiff stated the following regarding changes that had occurred in her daily activities since she last completed a disability report: "I am very indecisive about meal preparation, transportation arrangements, emotional support daily. The night tremors make my body sore the next day." (R. 298).

A Disability Report Form - Appeals dated June 9, 2014 states a change in Plaintiff's illnesses, injuries, or conditions since she last completed a disability report. Plaintiff stated the following in regard to changes that had occurred: "Blood pressure had worsened. It is now, for the first time in years, under control and normal. I am on lots of blood pressure medication." Plaintiff approximated these changes to have occurred on March 19, 2014 (R. 312).

The report form further states Plaintiff has new physical or mental limitations because of her illnesses, injuries, or conditions since she last completed a disability report. Plaintiff stated the following regarding her new physical or mental limitations: "Thyroid Disorder – on Synthroid Determined to be malignant hypertension." Plaintiff approximated these changes to have occurred on March 19, 2014 (R. 312).

The report form goes on to state the Plaintiff has new illnesses, injuries, or conditions since she last completed a disability report. Plaintiff stated the following regarding her new illnesses, injuries, or conditions: "Muscle disease. I see a rheumatologist for diagnosis and treatment." Plaintiff approximated these new changes to have occurred on May 22, 2014. (R. 312).

The report form further states a change in Plaintiff's daily activities. Plaintiff stated the following regarding changes that had occurred in her daily activities since she last completed a disability report: "I am tired more than normal. I am sleeping 4 ½ to 5 hours at night. Tremors are harder at night. Medications cause drowsiness and anxiety and I have to take them." (R. 317).

F.     **Lifestyle Evidence**

On an adult function report dated September 20, 2013, Plaintiff, when asked how her illnesses, injuries, or conditions limit her ability to work, stated the following:

> My illnesses limit my ability to work because when I have a
> seizure, it takes me sometimes a month to get my balance,

22

> memory, and just common sense back. I have tremors every night which causes me not to sleep well all night. My malignant high blood pressure keeps me having a daily headache as well as seizures. Naturally I am tired and get depressed. Body is sore from tremors.

(R. 277). When asked to describe what she does from the time she wakes up until going to bed, Plaintiff stated that when she wakes up she takes all of her medication and eats her breakfast. (R. 278). Plaintiff further stated that she makes her bed and looks "for something easy to make for dinner." Id. Plaintiff feeds her dog, brushes her teeth, has dinner, watches television, takes her medicine for the night, and lays down. Id.

When asked what activities Plaintiff could do prior to her illnesses, injuries, or conditions, Plaintiff stated she could work full-time, "have a social life (picnics, etc.)," clean her house, and "move around without worrying about falling." Id. As to how her conditions impact her personal care, Plaintiff stated she must wait for her daughter to get home from school to dress, bathe, care for her hair, and shave. Id. Plaintiff's parents call her daily and remind her to take care of her personal needs, and to make sure Plaintiff has taken all of her medications. (R. 279). Plaintiff's husband also reminds her to take care of personal needs and grooming. Id.

Since Plaintiff's illnesses, injuries, or conditions began, Plaintiff has experienced changes in her cooking habits. Id. Plaintiff stated she waits until her daughter gets home to cook because she is "sometimes not steady around [the] stove." Id. Plaintiff further requires help with house and yard work. Id. Plaintiff can do her own laundry, but her "husband carr[ies] down [her] basket." Id. Plaintiff tries to dust and sweep the floor. Id. However, Plaintiff stated she requires encouragement to do the house work when her "legs and arms are sore." Id. Plaintiff stated house work is limited "due to how [she] feel[s]." (R. 280).

When asked about going out, Plaintiff stated that she cannot go out alone. Id. Plaintiff's doctor has "stopped [her] from driving." Id. Plaintiff stated she does not drive because her "mental state, medicines, and health problems do not make it safe." Id. Plaintiff stated she has had a seizure on the highway. Id. Plaintiff further stated that she her ability to handle money has changed since her illnesses, injuries, or conditions began. (R. 281). Specifically, Plaintiff stated the change in her ability to handle money occurred because her "brain lesion is on the side of [her] brain that is used for critical thinking." Id.

When asked about her hobbies, interests, and social activities, Plaintiff stated she watches television, sports, news, but how often she does those activities is limited depending on how she feels. Id. Since Plaintiff's illnesses, injuries, or conditions began, Plaintiff "really [does] not do any extracurricular activities." Id. Plaintiff stated she mostly stays home now and described herself as a "home body." (R. 282).

On a second adult function report dated March 10, 2014 Plaintiff reported she no longer prepares food or meals. (R. 303). Plaintiff stated she that she did not cook "for safety reasons." Id. Because of Plaintiff's memory, she no longer uses the stove at all. Id. Plaintiff further reported that she still receives reminders in taking her medicine. Id. Plaintiff's husband puts Plaintiff's medicine in her pill box as a reminder for Plaintiff to take the medication during the day. Id.

**G.      Seizure Questionnaires and Third-Party Questionnaires**

In a seizure questionnaire dated September 30, 2013 to October 2, 2013, Plaintiff provided the following people had witnessed Plaintiff have a seizure: Kay Gant, Richard Gant, John D. Campbell, Tracey Claggett, Lesley Goines, and Larry Goines. (R. 287). Plaintiff reported her two most recent seizures occurred on August 15, 2013, and July 21, 2013. (R. 288).

24

Plaintiff stated she had at least four seizures in the past six months and had at least eight seizures in the last twelve months. Id. Third party questionnaires were completed and provided by Kay Gant, Tracey Claggett, and Larry Goines. (R. 289–91).

In a supplemental seizure questionnaire dated January 7, 2016, Plaintiff reported she had 18 seizures in the past 3 months and 30 seizures in the past 6 months. (R. 333).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since May 30, 2013, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairment: seizure disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. From March 30, 2013 through June 28, 2015, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except all postural movements were occasionally, except could never climb ladders, ropes, or scaffolds; work should not have required exposure to hazards such as unprotected heights or moving mechanical parts. Work should have not required greater than occasional exposure to concentrated levels of extreme temperatures, vibration, fumes/dusts/odors or pulmonary irritants. Work must have been carried out in 2 hour increments, which could be accommodated by regularly scheduled breaks.

6.      Beginning on June 29, 2015, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except all postural movements are occasionally, except can never climb ladders, ropes, or scaffolds; work should not require exposure to hazards such as unprotected heights or moving mechanical parts. Work should not require greater than occasional exposure to concentrated levels of extreme temperatures, vibration, fumes/dusts/odors or pulmonary irritants. Work must be carried out in 2 hour increments, which could be accommodated by regularly scheduled breaks. The work should not include commercial driving or operating heavy machinery. Work should not entail walking on uneven surfaces.  The work must be in a low stress environment.

7.      From March 30, 2013 through June 28, 2015, the claimant was capable of performing past relevant work as a college level instructor; middle school teacher; and tutor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565). From June 29, 2015, through the date of this decision, the claimant has been unable to perform any past relevant work.

8.      The claimant has not been under a disability, as defined in the Social Security Act, from May 30, 2013, through the date of this decision (20 CFR 404.1520(f)).

(R. 31-40).

# VI.      <u>DISCUSSION</u>

## A.      **Standard of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury

verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)).

However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

In social security proceedings, a reviewing Court must uphold the determination when an ALJ has applied the correct legal standards and the ALJ's factual findings are supported by substantial evidence. *See* <u>Brown v. Comm'r Soc. Sec. Admin.</u>, 873 F.3d 251, 267 (4th Cir. 2017). As noted above, case law has defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." <u>Hancock v. Astrue</u>, 667 F.3d 470, 472 (4th Cir. 2012). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005).

**B.      Contentions of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "fails to be supported by substantial evidence, and is erroneous as a matter of law." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that the ALJ erroneously evaluated the plaintiff's subjective complaints in finding that the Plaintiff was not credible and erroneously assessed the plaintiff's residual functional capacity in that she failed to address the combination of the Plaintiff's impairments, relied upon an expertise which she did not possess, and erroneously rejected the opinions of the Plaintiff's treating physician (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 4-12, ECF No. 15). Plaintiff asks the Court to reverse the judgment of the Commissioner or, in the alternative, to remand the case to the social Security Administration for a new administrative hearing. (Id. at 1).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that the ALJ appropriately evaluated Plaintiff's subjective complaints and appropriately assessed Plaintiff's residual functional capacity (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 3-6, ECF No. 24).

**C.    Analysis of the Administrative Law Judge's Decision**

    **1.    The ALJ's Credibility Determination is Supported by Substantial Evidence and is Not Patently Wrong**

        **a.    How Credibility is Analyzed**

The determination of whether a person is disabled by pain or other symptoms is a two-step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Craig, 76 F.3d at 594. Second, once this

threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id. Social Security Ruling 96–7p, which sets out factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, was superseded by SSR 16-3p effective March 28, 2016.[4] The factors mentioned remain the same, however, including:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

Id. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09cv55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

A determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to

---

[4] Federal Register Vol. 81, No. 51, page 14166, subsequently corrected by Federal Register Vol. 81, No. 57, page 15776; also published by SSA on their website, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di-01.html.

the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. However, in so doing, "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning. An ALJ's failure to consider an entire line of evidence falls below the minimal level . . ." Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995) (internal citation omitted).

### b. The ALJ's Credibility Determination

The Plaintiff argues that the ALJ's credibility determination fails to be supported by substantial evidence because she "failed to provide any assessment of which of the Plaintiff's statements she found to be credible, and which she did not." (Pl.'s Br. at 4, ECF No. 15). The Defendant argues that the ALJ's assessment of Plaintiff's seizure disorder and subjective symptom statements included "a detailed review of the Plaintiff's allegations and medical evidence and functional effects." (Def's Br. at 5, ECF No. 24).

As discussed above, there are several factors for an ALJ to use when assessing credibility of a claimant's subjective symptoms and limitations. However, an ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 U.S. Dist. LEXIS 9720, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). As further noted above, the ALJ's credibility determinations are accorded great weight and are "virtually unreviewable." Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984); Ryan v. Astrue, No. 5:09cv55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, it is the Plaintiff's burden to show the credibility determination was "patently wrong." Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

Here, the undersigned finds that the ALJ properly followed the two-step process when determining that the Plaintiff's "statements concerning the intensity, persistence and limiting effects" of her symptoms "are not entirely consistent with the medical evidence and other evidence in the record." (R. 35).

### i.  Plaintiff's Daily Activities

The ALJ considered Plaintiff's statements regarding her daily activities (factor one) when assessing her credibility. Specifically, the ALJ documented that Plaintiff stated that she "does not drive, visit her daughter, participate in church, play tennis, coach, hold babies, cook, or carry baskets of laundry. She reported that she has to have a family member watch her when she showers." (R. 35).

After detailing Plaintiff's statements regarding her daily activities, the ALJ indicated that from "March 30, 2013 through June 28, 2015, the evidence showed no significant change in the claimant's condition from the March 29, 2013 prior decision." Id. The ALJ noted that a CT scan of Plaintiff's brain from July 2013 "was stable with no hemorrhage or shift" and a physical examination of the Plaintiff "showed normal sensory, left upper extremity strength, right upper extremity strength, left lower extremity strength, right lower extremity strength." (R. 35-36). The ALJ went on to accord great weight to the findings of Dr. Seth Tuwiner who conducted a consultative examination of the Plaintiff in December of 2013. (R. 36). Upon physical examination, the ALJ noted that Dr. Tuwiner found the Plaintiff had "an antalgic gait. However, she was able to toe walk. She exhibited 5/5 strength in all extremities." Id. The ALJ went on to detail Dr. Tuwiner's opinions, including that he opined Plaintiff could stand or walk five to six hours in an eight-hour day, had no limitation with sitting, did not require an assistive device, and could lift approximately thirty pounds occasionally and fifteen pounds frequently. Id.

32

### ii.  Plaintiff's Pain and Other Symptoms

The ALJ reviewed the location, duration, and frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that Plaintiff has alleged difficulty with "lifting, standing, reaching, walking, stair climbing, seeing, remembering, completing tasks, concentrating, and following instructions. She stated that she has difficulty with functions because of balance issues, leg soreness, blurred vision, and memory loss." (R. 35). The ALJ further discussed Plaintiff's statements regarding her seizure disorder in detail, including the Plaintiff's statements regarding the frequency of her seizures, third party statements from individuals who had allegedly witnessed her seizures, and the statement submitted by Dr. Edward Thompson. (R. 35, 37-38).

After discussing the Plaintiff's seizures in detail both before and after the worsening of Plaintiff's condition as of June 29, 2015, the ALJ stated that there is "insufficient evidence to conclude that this brief period of increased seizure activity represents her new baseline level of functioning." (R. 38). The ALJ noted that medical records reflect that the Plaintiff and her husband admitted that she can go months without a seizure and her seizures were variable. (R. 37). The ALJ specifically cited to the record and included that in January of 2016, "the claimant was evaluated at Parkway Neuroscience, and at that time, she admitted that her seizures had been stable until this year (Exhibit B35F/6)." Id.

Indeed, the medical records reflect that Plaintiff "relates having one seizure every one to two years and prior to this June, the last event was on April 09, 2015 and prior to that about two years ago." (R. 1107). The record further states that Plaintiff had been evaluated at the "University of Maryland in the past with SPECT scans that reportedly showed a lesion, now

gone." Id. The ALJ further noted that Plaintiff admitted her "seizures were stable until 2016" (R. 38) and she had 5/5 strength in her extremities and required no assistive device to ambulate. Id.

Accordingly, after a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear her reasoning in finding Plaintiff's "statements concerning the intensity, persistence and limiting effects" of her symptoms "are not entirely consistent with the medical evidence and other evidence in the record." (R. 35). Thus, the burden was on the Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight it is entitled and finds it is based on substantial evidence.

### c. The ALJ Properly Accorded Little Weight to the Physician Statement Submitted by Dr. Edward Thompson

The Plaintiff argues the ALJ "erroneously evaluated the opinions of the Plaintiff's treating physician, Dr. Edward Thompson." (Pl's Br. at 10, ECF No. 15). The Plaintiff argues this error is in violation of the "treating physician rule."

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

> *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)

and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion.  Furthermore, because

35

> nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.
>
> (4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
>
> (6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig v. Chater, however, the Fourth Circuit further elaborated on this rule:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques

36

> and is not inconsistent with the other substantial evidence in [the]
> case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by
> clinical evidence or if it is inconsistent with other substantial evidence, it
> should be accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Some issues are reserved specifically for the Commissioner and opinions on such issues "are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)).

However, a treating physician is not credible when his treatment was infrequent, and his opinion was unsupported by his own treatment notes or other information in the file. Russell v.

Comm'r of Soc. Sec., 440 Fed.Appx. 163 (4th Cir. 2011). A treating physician also loses credibility when her testimony is directly contradicted by her own treatment notes. Burch v Apfel, 9 Fed. Appx. 255 (2001) (Treating physician given little credibility when she testified that 1) Claimant was admitted to the hospital for suicidal thoughts, when her notes clearly indicated Claimant's condition was stable and she was not considered harmful to herself or others; 2) Claimant's poor response to medication was not her fault, when treatment notes clearly indicated otherwise – "as usual she had not given the medication adequate time to reach some degree of remission;" 3) Claimant's alcohol consumption did not contribute to her failure to recover, when notes indicated Claimant continued to drink against physician's advice and that it was "not beneficial;" and numerous other contradictions and inconsistencies discussed at length by the ALJ).

Here, the undersigned finds that there is no evidence in the record outside of the seizure questionnaire submitted by Dr. Edward Thompson that would suggest he has been the Plaintiff's treating physician. As a result, the consistency and duration of Plaintiff's treatment relationship with Dr. Thompson is not supported by the record. Plaintiff's record and testimony at the hearing reflect that her seizure disorder has been treated by Dr. Rafiq, Dr. Goodman, and currently is being treated by Parkway Neuroscience in Hagerstown, Maryland. (R. 80-82). Dr. Thompson states he is Plaintiff's treating physician at Barquist Medical Health Clinic at Ft. Detrick. (R. 1098). However, a review of the records shows the vast majority of treatment Plaintiff received at Barquist has been through Dr. William Swann.

In according little weight to the medical source statement offered by Dr. Thompson, the ALJ stated that "he based his opinion on the claimant's frequency of seizures on the claimant's subjective reports. The claimant's seizures were admittedly variable, and she was capable of

going months without a seizure." (R. 38). As noted above, in reviewing an ALJ's decision for

support based on substantial evidence, a reviewing Court does "not undertake to reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

[ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). As a result, the undersigned

finds that the ALJ's decision to credit little weight to the medical source statement of Dr. Edward

Thompson was proper.

### 2. The ALJ's Opinion Regarding the Results of Plaintiff's Electroencephalogram (EEG) Were Harmless

Plaintiff further argues that the ALJ utilized an expertise which she does not possess in

the field of neurology in that the ALJ stated the following regarding results of Plaintiff's EEG:

> Indeed, an electroencephalogram (EEG) performed the month prior to this opinion
> showed only mild generalized slowing, which is not suggestive of appreciable worsening
> at that time.

(R. 36-37). While the undersigned agrees that the ALJ, in making this statement, has exercised

an expertise she does not possess, the undersigned finds this error was harmless in nature

because it does not render the ALJ's otherwise well-reasoned credibility determination improper.

See Emigh v. Comm'r of Soc. Sec., No. 3:14-CV-36, 2015 U.S. Dist. LEXIS 15610, 2015 WL

548533, at *21 (N.D. W. Va. Feb. 10, 2015) ("The Court will not reverse an ALJ's decision for

harmless error, which exists when it is clear from the record that the ALJ's error was

inconsequential to the ultimate nondisability determination.").

### 3. The ALJ's Residual Functional Capacity Assessment is Supported by Substantial Evidence

#### a. The ALJ Properly Considered the Cumulative Effect of Plaintiff's Conditions and Symptoms in Assessing Plaintiff's Residual Functional Capacity (RFC).

The Plaintiff argues that the ALJ "failed to address the combination of the Plaintiff's

impairments, relied upon an expertise which she did not possess, and erroneously rejected the opinions of the Plaintiff's treating physician" and therefore, her residual functional capacity assessment fails to be supported by substantial evidence. (Pl's Br. at 12, ECF No. 15). Plaintiff's arguments regarding the ALJ's reliance on an expertise she did not possess and the rejection of the opinions of Plaintiff's treating physician have already been addressed herein leaving only the argument that the ALJ failed to address the combination of the Plaintiff's impairments.

Here, the undersigned finds that the ALJ properly weighed and considered the evidence when deciding what impairments were severe and which were non-severe. The ALJ only found that Plaintiff's seizure disorder was a severe impairment, while all other alleged impairments were found to be non-severe for the period at issue. Again, it must be noted that in reviewing an ALJ's decision for support based on substantial evidence, a reviewing Court does "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

In addition to seizures, the Plaintiff alleged disability based on recurrent migraine headaches, hypertension, anxiety and depression, and irritable bowel syndrome. The ALJ found all alleged impairments to be non-severe and only found that Plaintiff's seizure disorder was a severe impairment. (R. 32). As to Plaintiff's alleged migraines, the ALJ found no evidence of intracranial abnormality that could be expected to cause Plaintiff's alleged headaches noting that Plaintiff's MRI showed that the "benign parietal brain lesion previously present had resolved." (R. 32, 892). It was noted by the ALJ that the record reflects that Plaintiff was able to tolerate her headaches and declined medication. (R. 1109). In considering the combined effects of Plaintiff's headaches and her seizure disorder, the ALJ noted that the medical evidence is indicative that Plaintiff's headaches are present "post-seizure" and therefore, "accommodating Plaintiff's

seizure disorder would also accommodate her alleged headaches." (R. 32). Regarding hypertension, the ALJ noted no relevant functional limitations and that it "appeared controlled with appropriate treatment." (R. 33, 478, 1016). Furthermore, the ALJ made a detailed discussion of Plaintiff's impairments of anxiety and depression, considering both singly and in combination in deciding they did not pose more than minimal limitation on her ability to perform the mental demands of work activities. (R. 33).

The ALJ properly considered the four broad functional areas as required by the disability regulations for evaluating mental disorder and properly considered Section 12.00C of the Listing of Impairments. (R. 33). The ALJ found that Plaintiff's anxiety and depression did not cause any more than mild limitations, found no evidence of episodes of decompensation of extended duration, and therefore appropriately found the conditions to be nonsevere. Id. The ALJ further noted in detail that Plaintiff's concentration, persistence, or pace had improved throughout the record and that a November 17, 2014 evaluation was negative for depression. (R. 33, 668).

The ALJ further properly weighed and considered the evidence of medical source Dr. Edward Thompson as discussed above against the evidence of consultative examinations conducted by Dr. Seth Tuwiner and independent agency reviewers Dr. Subhash Gajendragadkar and Dr. Fulvio Franyutti who each reviewed the RFC as provided by Dr. Seth Tuwiner and each independently agreed with his findings in reaching identical conclusions. These findings were properly accorded great weight in the ALJ's determination of Plaintiff's residual functional capacity.

## 1.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is

supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 14) be **DENIED,** Defendant's Motion for Summary Judgment (ECF No. 23) be **GRANTED**, the decision of the Commissioner be affirmed, and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Senior District Judge Irene Keeley, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this 7th day of January, 2019

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE